IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

FILED
MAR - 1 2016
Clerk, U S District Court
District Of Montana
Billings

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>HOPE MARGIE RATHBUN,<br><br>Defendants. | CR 15-59-BLG-SPW<br><br>OPINION AND ORDER |

Defendant Hope Rathbun has moved to suppress statements she made to law enforcement on November 13, 2014. (Doc. 35). She contends that without her statements, the warranted search of her home lacked probable cause so the evidence discovered during the search must be suppressed. On January 7, 2016, this Court held a hearing on her motion. The Court heard testimony from United States Deputy Marshals Timothy Hornung and Mike Smith, Yellowstone County Sheriff's Deputies Shane Skillen and Patrick Korb, Billings Police Department Detective Mike Robinson, and Defendant Hope Rathbun.

After hearing the testimony, the Court expressed concern about the legality of law enforcement's initial entry into the residence. The parties agreed to brief the issue and a second hearing was held on February 26, 2016. The Court heard testimony from Stephanie Abrahams, a co-resident of the home. After considering

1

the testimony and the parties' submissions, the Court grants Rathbun's motion for the reasons set forth below.

## I. Background

Joseph Doney had an outstanding warrant for aggravated assault with a weapon. The Montana Violent Offender Task Force obtained information on November 14, 2013, placing Doney at a residence at 108 Buena Vista. Rathbun, Stephanie Abrahams, Jewel Glendenning, and Julia Sullivan lived at 108 Buena Vista. Heather Krengel, the mother of Doney's child, told United States Deputy Marshal Mike Smith that Doney had taken her car, a white Pontiac, approximately two weeks prior and had not returned it. Krengel had seen her car parked at either 108 Buena Vista or the 800 block of Arlington, and if her car was there, Doney was there. (Exhibit 4). Smith interpreted Krengle's statements to mean that Doney was "staying" at Buena Vista "off and on." Krengle warned Smith that Doney always carried a gun and it would either be on him or in the Pontiac.

Task Force Officer Chris Evans and United States Deputy Marshal Tim Hornung went to 108 Buena Vista and saw the Pontiac parked outside. After they set up surveillance to wait until the rest of the Task Force arrived, a white male left 108 Buena Vista and drove away. Evans and Hornung stopped the man and after questioning him, confirmed that Doney was in the residence at 108 Buena Vista, with four other people. When the rest of the Task Force arrived, Deputy Marshal

2

Smith knocked and announced and when no one answered, he, and Deputy Marshals Hornung and Cable, Yellowstone County Sheriff's Lieutenant Skillen, and State Probation Officer Evans entered the residence to arrest Doney. Once inside the residence, Smith, Cable and Evans went to the left, and Skillen and Hornung went to the right.

Skillen and Hornung focused on a closed door at the back of the trailer. (Doc. 36, Exhibit B). They knocked on the door and announced their presence several times. (*Id.*) They received no response, so they entered the room. (*Id.*) Rathbun was sitting on the bed. In a connected bathroom, they found a male who had outstanding warrants for his arrest. Skillen handcuffed the man and took him into the living room where he was ultimately arrested. Hornung stayed in the bedroom with Rathbun. He noticed a methamphetamine pipe in an ash tray on the bed next to Rathbun and asked her where the drugs were. She pointed to a bag hanging on the closet door. Hornung handcuffed Rathbun. Inside the bag he found a black pouch containing green baggies with what looked like methamphetamine in each bag. Hornung dumped the contents of the bag onto the bed. He asked Rathbun if there were any weapons in the room. Rathbun told him there were a couple of Tasers and pointed him to a medium size blue bag. Hornung found a Taser and a digital scale in the bag, which he also put on the bed.

Hornung yelled that he had found drugs and drug paraphernalia and asked for other law enforcement to come to the room. When Lt. Skillen entered the room, Rathbun told Hornung there was methamphetamine in her purse. Lt. Skillen saw an open purse on the same side of the bed as Rathbun. In it, he saw several clear plastic bags containing what appeared to be methamphetamine. Lt. Skillen took Rathbun to the living room, removed her handcuffs, and told her to sit on the couch and remain there. He also told Officer Evans to watch Rathbun while the City-County Special Investigations Unit ("CCSIU") Detectives were called. Other officers continued to search the residence.

Meanwhile, Smith, Cable and Evans had located and arrested Doney. Two other women were located at the other end of the residence. During Evans' protective sweep of the residence, he saw marijuana in a purse on the bedroom floor and a marijuana pipe on the night stand. CCSIU Detectives Korb, Tuss and Robinson arrived. Detective Korb told Rathbun that based on the officers' observations of drugs and drug paraphernalia he was going to apply for a search warrant. Rathbun told him that she sold drugs to pay the bills. Korb left Rathbun with Detectives Tuss and Robinson to apply for the search warrant.

Detectives Tuss and Robinson read Rathbun her *Miranda* rights. Rathbun signed the waiver and agreed to speak with the detectives. Rathbun provided a statement regarding her drug activity.

Detective Korb ran a records check with the Montana Department of Health and Human Services and confirmed that none of the individuals in the residence possessed a valid Montana Marijuana card. He applied for, and was granted, a search warrant for the residence and the Pontiac from State District Court Judge Knisely. Officers discovered drugs, drug paraphernalia, cell phones, and a .45 caliber Springfield firearm during their search of the residence.

## II. Discussion

As a threshold issue, the Court must determine whether law enforcement's entry into Rathbun's residence was lawful. The government argues that law enforcement's arrest warrant allowed law enforcement to enter the residence at 108 Buena Vista and arrest Doney because the officers had probable cause to believe that Doney resided there. The facts of this case indicate otherwise.

To execute an arrest warrant inside a particular residence, law enforcement officers must have probable cause to believe that the person to be arrested lives at the residence to be searched. *Payton v. New York*, 445 U.S. 573 (1980). Under *Payton*, "an officer must have a reasonable belief that the suspect named in the warrant resides in the third party's home and that he is actually present at the time of the entry into the home." *Watts v. County of Sacramento*, 256 F.3d 886, 889-90 (9th Cir. 2001).

If the suspect named in the arrest warrant is a guest of the homeowner, then in the absence of exigent circumstances, the police must obtain a search warrant for the home itself to avoid violating the homeowner's Fourth Amendment rights. *Id.* (citing *United States v. Litteral*, 910 F.2d 547, 553 (9th Cir.1990)). In other words, "if the police lack probable cause to believe the suspect is an actual co-resident, but have probable cause to believe he's present, they must get a search warrant." *United States v. Harper*, 928 F.2d 894, 896 (9th Cir. 1991).

According to the Ninth Circuit, substantial evidence pointing to the suspect's co-resident status is required to create a reasonable belief that he lives in the home of a third party. *See Watts*, 256 F.3d at 890, collecting cases. In *Harper*, 928 F.2d at 896-97, substantial evidence existed where law enforcement corroborated an anonymous tip with (1) confirmation that the home was leased to the suspect's family, (2) the fact that suspect's two brothers lived there, (3) police observation of suspect entering home with his own keys, (4) evidence suggesting that suspect had no other residence, and (5) police observation that cars parked outside home belonged to "known associates" of suspect. Similarly, *United States v. Dally*, 606 F.2d 861, 862 (9th Cir. 1979), law enforcement corroborated an anonymous tip with ATF agents' observation that suspect's car was parked outside defendant's home overnight, suspect had a key to defendant's home, and suspect returned to the home with dry cleaning in hand.

The government contends that the following facts, in combination, were sufficient to establish probable cause that Doney lived at 108 Buena Vista: (1) Krengel told Deputy Marshal Smith that Doney "stayed" at 108 Buena Vista; (2) task force surveillance saw Doney's car at 108 Buena Vista on November 14, 2013; (3) a man leaving the residence told surveillance that Doney was at the residence at that time. These facts, considered in their totality, are insufficient to establish probable cause under *Payton* and *Watts*, however.

First, Krengel's statement to Smith was entirely ambiguous. Smith testified that Krengel told him "[Doney] was currently staying there or is staying there off and on" but he couldn't recall. (Doc. 53 at 69-70). When asked to clarify what information he had that Doney actually lived at the residence and was not just visiting on that afternoon, Smith simply responded that Krengel said that "he stays there." (*Id.*) Further testimony established that Krengel had merely seen her car, which Doney had stolen, at 108 Buena Vista and another place. While potentially sufficient to establish that Doney may have been an occasional guest at 108 Buena Vista, this testimony does not provide any definitive information about where Doney lived at the time.

Notably, neither Doney, nor Rathbun nor any of her co-residents identified 108 Buena Vista as Doney's residence. *See United States v. Watts*, 67 F.3d 790, 793 (9th Cir. 1995), rev'd on other grounds, 519 U.S. 148 (1997) (a legal occupant

7

of the house "told police that she and [the defendant] lived there together."); *see United States v. Conway*, 122 F.3d 841, 843 (9th Cir. 1997) (the defendant referred to a bedroom "as 'his.'"). On the contrary, Stephanie Abrahams, a resident at 108 Buena Vista, testified that only she, Rathbun, Jewell Glendenny and Abrahams' daughter lived at the residence. According to Abrahams, Doney came to visit her about three to four times that month. Based on the circumstances, Krengel's statement cannot be reasonably understood as stating that Doney lived at 108 Buena Vista as opposed to simply being a guest there.

Second, law enforcement had reason to believe that Doney did *not* live at the residence. Law enforcement knew who lived at 108 Buena Vista before Doney's arrest, and it was not Doney. Specifically, Lt. Skillen testified that 108 Buena Vista was a "common address" he had responded to and had been there "several times." (*Id.* at 27:2-3). His recollection was that Mineo Tanniguchi and his step-brother, Steve French, lived at the residence. (*Id.* at 6-9). He did not recall that Doney lived there. (*Id.*)

Further, law enforcement had never observed any signs that Doney even stayed overnight at 108 Buena Vista. Their surveillance of 108 Buena Vista was perfunctory to say the least. They did not conduct any surveillance to see if Doney had a key to 108 Buena Vista, or came and went from the residence with personal effects like dry cleaning, or whether he stayed overnight, or if any of his "known

8

associates" also came and went from the place, or any other indicia that he was treating it as a residence. *Watts*, 256 F.3d at 890. After seeing the Pontiac at the residence, they stopped a man who was leaving and confirmed that Doney was inside. These two facts are not substantial evidence that Doney was a resident, as opposed to a visitor, at 108 Buena Vista.

The evidence before the Court is that law enforcement had probable cause to believe Doney was present at 108 Buena Vista. However, they lacked probable cause to believe that he was an actual resident. Accordingly, law enforcement was required to obtain a search warrant or consent to enter the residence. They did neither. As a result, all of the evidence obtained from the search must be suppressed.

### III. Conclusion

For the reasons stated above, Rathbun's Motion to Suppress (Doc. 35) is GRANTED.

DATED this 1st day of March, 2016.

*Susan P. Watters*

SUSAN P. WATTERS
United States District Judge